In the Matter of MORTIMER ELLIOTT, an Attorney, Respondent.

First Department, July 5, 1928.

*Einar Chrystie* of counsel, for the petitioner.

*David Kraus,* for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division, Supreme Court, First Department, in October, 1913, under the name of Isidore Mortimer Eisenberg.

On July 10, 1916, he was, by an order of this court, suspended from practice for the period of one year. On October 21, 1919, he was reinstated by this court. Thereafter he commenced a proceeding in the City Court of New York, in the name of Mortimer Eisenberg, for the change of his name to Mortimer Elliott, permission to assume which name was granted by said court on November 12, 1920, and under that name he has since practiced.

These proceedings were originally brought against respondent on four charges, based on his conduct with certain of his clients in relation to matters which may be referred to as (1) Nathan Rogin; (2) Morris Berkenblit; (3) Vincenzo Fede; (4) Franktone Building Company. An additional charge was filed against respondent by supplemental petition, based on his conduct with his clients (5) Abraham and Leib Sluchansky.

The learned official referee who heard these charges has reported that all these five charges have been substantially sustained by the proof.

Considering them in detail, the charges and evidence may be summarized as follows:

(1) The *Nathan Rogin* charges.

On or about November 25, 1924, Nathan Rogin, a druggist, retained the respondent to look after his interests in the matter of certain proceedings of the Prohibition Department to revoke his permit to sell liquor, and gave respondent the sum of $1,000, for which the respondent gave Rogin a receipt setting forth an agreement then made between them, which receipt reads as follows:

" MORTIMER ELLIOTT,
" Counselor at Law,
" 1540 Broadway,
" New York, N. Y.
" Telephone Bryant 3807–3808
" *Nov.* 25, 1924.

" I received from Nathan Rogin the sum of $400.00 on account of the sum of $1,000.00 which is to be paid me under the following terms and conditions:

" I am to defend said Nathan Rogin before the Prohibition Director in the matter of proceedings instituted against him to revoke his permit No. N. Y. –I–5436; in the event said permit is revoked, I am to refund the sum of $750.00 to said Nathan Rogin; otherwise I am to retain the full sum of $1,000.00. I further agree to represent said Nathan Rogin in all matters pertaining to his permit for a period of one year from date.

" The balance of $600 is to be paid to me on or before December 2, 1924. MORTIMER ELLIOTT."

The balance of $600 was paid by Rogin to respondent on December 2, 1924.

The proceedings before the Prohibition Director terminated in the revocation of the liquor permit issued to Rogin, the respondent having represented the latter therein.

Thereafter Rogin requested respondent to return to him the sum of $750 in accordance with the terms of the agreement above set forth, and on or about March 4, 1925, respondent gave his check to Rogin, dated April fourth, for $700, on account of the moneys he had agreed to repay, which check when deposited was returned unpaid, with a notice from the bank upon which it was drawn that respondent no longer had an account therein. Rogin notified respondent that the check had been returned unpaid and then went to the district attorney's office and made complaint. The assistant district attorney sent for respondent, who appeared, and on or about April twentieth delivered to the former two checks for $350 each, one dated April twenty-third and the other April thirtieth. When these checks were presented for payment, it was refused, on one occasion because there were insufficient funds, on the other because they were " drawn against uncollected accounts." When Rogin made his complaint to the committee on grievances of the Bar Association, on May 5, 1925, no part of the money which respondent had agreed to return to him had been paid, but such payment was made thereafter in installments after Rogin had retained an attorney to collect the amount due him.

Respondent claims that he repaid the money before he knew of any complaint made to the Bar Association, and that Rogin's only grievance was to get back the money he had paid, because he had decided to sell his store. He also admits that his clerk was late in appearing at the Federal Prohibition hearing, but states that Rogin did not appear there, either, and that because of the failure of either client or attorney to appear, the permit was revoked by default; and he claims that steps were taken by him to reopen the proceedings. He also claims that the record indicates that Rogin received his checks with the understanding that they were not to be used until after " complete disposition of the respondent's work," but that Rogin used the checks, " with the result that they were not paid when presented." He claims that he was still " actively engaged in efforts to regain the permit " when Rogin asked him to discontinue the work, and that, therefore, he was under no obligation to return the money to Rogin, but did so voluntarily and, therefore, was guilty of no misconduct, even though his checks were dishonored.

In reference to this and the two following charges, it is to be noted that respondent never had been enrolled as a practitioner before the officers of the Treasury Department, as required by law, and, therefore, was not qualified or authorized to appear for any client as attorney in proceedings pending in the Prohibition Department when he induced Rogin, Berkenblit and Fede to retain him and to pay him the amounts called for by his receipts given to them, and that he could not legally fulfill his obligations to represent them in the revocation proceedings then pending.

(2) *Morris Berkenblit.*

On January 24, 1925, Morris Berkenblit, a druggist, retained the respondent to look after his interests in the matter of certain proceedings of the Prohibition Department to revoke his permit to sell liquor, and gave respondent the sum of $500, for which respondent gave Berkenblit a receipt, setting forth an agreement then made between them, as follows:

" MORTIMER ELLIOTT
" Counselor at Law,
" 1540 Broadway,
" New York, N. Y.
" Telephone Bryant 3807–3808
" *January 24th,* 1925.

" Received from Morris Berkenblit check for $500.00 under following terms and conditions:— I am to make application to Prohibition Director for rehearing in the matter of proceedings heretofore brought to revoke Permit No. I–7705; if successful in keeping Permit for 1925 in full force and effect, I am to retain said sum of $500.00; otherwise, I am to refund the sum of $450.00 to said Morris Berkenblit.

" MORTIMER ELLIOTT."

The proceedings terminated in the revocation of Berkenblit's license, respondent acting as his attorney therein.

On April 14, 1925, respondent agreed with Berkenblit that unless he succeeded in having the permit restored to him by April seventeenth at noon, he would return the $450 called for by the receipt. The permit has never been restored, and respondent had defaulted on the return of the motion made by him for an injunction in Berkenblit's behalf in the United States District Court. On or about May 15, 1925, Berkenblit demanded from respondent the payment of said $450. Respondent then gave him two checks, one for $200 dated May sixteenth, another for $250 dated May nineteenth. When the first of these checks was presented for payment at the bank on which it was drawn, it was dishonored

upon the ground that respondent's account therein had been closed. Respondent had drawn out his entire balance in the bank on which the checks were drawn on May fifteenth. Thereafter, on renewed demands, respondent gave Berkenblit on June second two checks upon a different bank in like amount, one dated June second, another dated June seventh, and when these were presented for payment they also were returned unpaid because of insufficient funds to meet them, respondent having drawn out from said bank on June eighth his entire balance of $39.34.

Thereafter on June 17, 1925, Berkenblit made complaint to the grievance committee of the Bar Association, and some time thereafter respondent paid him the amount due him.

Respondent's answer to this charge is that Berkenblit also had contracted to sell his drug store and, therefore, would have no use for a permit; that Berkenblit having ceased to be interested in keeping his permit, respondent committed no misconduct in keeping the moneys he had contracted to repay; that Berkenblit did not permit respondent to complete his work (which, as has been stated, he had no lawful right to perform), and that his repayments to Berkenblit were voluntary.

(3) *Vincenzo Fede.*

On September 10, 1925, Vincenzo Fede, a druggist, retained the respondent to look after his interests in the matter of certain proceedings of the Prohibition Department to revoke his permit to sell liquor, and he then gave respondent the sum of $400, for which respondent gave Fede a receipt setting forth an agreement then made between them, as follows:

" 9 /10 /25

" Rec'd from Vincenzo Fede Check for $400.00 for services in matter of Permit I 8180 — Said sum is to be refunded if 2 quotas of liquor are cancelled.

"MORTIMER ELLIOTT."

Respondent acted for Fede in the proceedings, which terminated by the revocation of Fede's permit to sell liquor and the cancellation of his permit to withdraw for sale the two quotas of liquor referred to.

After Fede's permit had been revoked and respondent had failed to obtain for him the two quotas of liquor, as provided in the receipt, Fede demanded the return of the $400 in accordance with the terms thereof. On January 19, 1926, in a registered letter to respondent, Fede threatened to write to the Bar Association if he did not pay the money. The respondent failed to comply with Fede's request, and Fede brought the matter to the attention of the Bar Association. On the day of the hearing before the committee on grievances the respondent called at Fede's place

of business and by promise of payment tried unsuccessfully to induce Fede not to attend the hearing. About two or three months after the hearing respondent paid Fede $375 in settlement of his claim. After respondent paid this money to Fede and some time in October, 1926 (after this proceeding had been commenced), the respondent prepared an affidavit, entitled in this proceeding, which he requested Fede to verify. Fede declined to do so. The proposed affidavit contained the following allegations: " Vincenzo Fede, being duly sworn, deposes and says: I am engaged in business at 6702 Thirteenth Avenue, Borough of Brooklyn, New York City, and am the person who is mentioned herein as a complainant against Mortimer Elliott. As a matter of fact, I am not acquainted with the English language sufficiently to understand that I am regarded as a complainant against Mr. Elliott. I had a dispute with Mr. Elliott as to the amount of money which should be refunded me and was advised by a friend of mine to go to the Bar Association. It was not my purpose to charge Mr. Elliott with any misconduct. As a matter of fact, Mr. Elliott at all times has conducted himself towards me as an honorable attorney, and has done nothing which would warrant my being a complainant against him. I cannot conscientiously give any testimony which would reflect upon Mr. Elliott's conduct during the time when he appeared for me as attorney in proceedings instituted against me by the Federal Prohibition Department."

Upon Fede's refusal to sign this affidavit, respondent on December 7, 1926, brought an action in the Municipal Court against Fede to recover back the $375 he had paid him, his complaint being stated as " The plaintiff repaid said sum of Three Hundred Seventy-five ($375.00) Dollars under protest to the defendant herein." The summons in that action was served on Fede on January 15, 1927. He had already testified before the official referee in these proceedings on January 11, 1927, and had been directed to return to complete his testimony on January twentieth. The obvious purpose of the commencement of the action and the service of the summons at this particular time was to intimidate Fede. That action was still pending when the learned official referee made his report, and he has stated therein that he is convinced that respondent paid the money to Fede for the purpose of inducing him to sign the proposed affidavit to be used in this proceeding.

Respondent's answer to this charge is that Fede defaulted in appearing at the hearings before the Federal Prohibition Administrator and for that reason his permit was revoked; that respondent was unable to locate one Carabilo who had brought Fede to his office, and could not secure his testimony; and that the reason

why respondent instituted the action against Fede was that he wanted the court to determine whether he was not entitled to retain the moneys since Fede did not carry out his contract by appearing at the prohibition hearings. He also claims that Fede had suggested the making of such an affidavit as respondent submitted to him for signature.

(4) *Franktone Building Company.*

On September 8, 1924, the Franktone Building Company, Inc., sold the premises on the northwest corner of Fifth avenue and Beatrice place, Maspeth, N. Y., to Frank Pidala. Prior to the sale the company had executed a mortgage on the premises sold to Pidala and other premises, which mortgage was held by one Firth. All of the loan secured by said mortgage had been repaid except the sum of $900, upon payment of which a release of the premises bought by Pidala would be delivered. On the day fixed for closing it developed that arrangements had not been made for the attendance of the representative of the holder of this mortgage with a release of the mortgaged premises, so that the $900 due thereon could not be paid at that time. It was accordingly agreed between the representative of the Franktone Building Company and the respondent acting in behalf of Pidala that Pidala would give to the respondent the amount of the principal due on the mortgage and accrued interest thereon, and that the respondent would in turn pay that money to the mortgagee and obtain from him the satisfaction of the mortgage which was to be canceled, together with the accompanying bond which had been executed by the Franktone Building Company. Pidala accordingly gave the money to the respondent, who in turn delivered to the representative of the Franktone Building Company a receipt as follows:

" *Sept.* 8 /1924.

" I have today rec'd $920.55 — from the Franktone Bldg. Company, Inc.— to pay Thaddeus Firth, Jr.,— to release plot 20' x 100' at No. W. Corner of Fifth Ave. Beatrice Place — Maspeth, N. Y. from $4500. mtge. dated 4 /21 /24 — recorded 4 /24 /24 — Sec. 9 — Block 2015 — Liber 2391 — Page 166 — Made by Franktone Bldg. Corp. Inc. to said Thaddeus Firth, Jr.

" MORTIMER ELLIOTT

" *Atty.*"

The Franktone Company thereupon credited Pidala with $920.35 on account of the purchase price of the property.

The respondent failed to use any part of the money received by him for the purpose of paying the principal and interest due on the mortgage held on the premises by Firth. On or about

December 29, 1925, the mortgagee instituted an action to foreclose the said mortgage, in which he named the Franktone Building Company and Pidala and the tenants of the premises as parties. A notice of pendency of this action was filed in the office of the clerk of Queens county on that day.

The respondent filed an answer to the complaint in this action in behalf of Pidala, but on motion the answer was stricken out as frivolous and judgment in favor of the plaintiff was granted upon the pleadings, and in order to prevent the sale of the property, Pidala paid to the attorney for the mortgagee approximately $1,200 for principal, interest and costs of the action. The respondent failed to pay any part of the mortgage money to Firth, converted the same to his own use, and because of such conversion the foreclosure action was forced to be begun.

On July 7, 1927, Pidala sent a letter to the Bar Association containing the following statements:

" In about May, 1924, the sum of $900.00 was due and payable on a mortgage on the property in which I live, namely 67 Fifth Avenue, Maspeth, L. I.    I gave Mr. Elliott $900.00, and he promised to deliver to me a satisfaction of the mortgage.   Mr. Elliott never paid this money to the mortgagee, and after proceedings were started to foreclose the mortgage, I was compelled to pay $1,263.93 which sum included interest and costs, in order to procure a satisfaction of the mortgage.   Mr. Elliott never repaid the $900 to me.

" As appears from the foregoing, Mr. Elliott converted the following sums:

" $900.00 which I gave him to satisfy the mortgage on my residence; $707.00, the sum which he was to pay to Mastan & Co. to liquidate the loan, and $4,400.00 which he procured from the Chamberlain's office.

" I told Mr. Elliott that I was going to complain to the Bar Association, and he asked me not to, promising to pay what he had converted.   He did make payment from time to time, and on January 15, 1927, he gave me a written agreement wherein he admitted owing me $2,643.67.   Since January 15, 1927, he has made payments, but there is still a balance of $1,549.92 due me, and which sum he now refuses to pay.

" I respectfully submit that this is a proper case for your investigation, for there does not seem to be any doubt, if my foregoing statements are true, that Mr. Elliott is a discredit, disgrace, and blot upon the legal profession, and a menace to society.   *   *   *

" Awaiting your call so that I may be of service to you, I am

" Respectfully yours,

" FRANK PIDALA."

Pidala acknowledged that the facts herein stated were true.

Respondent's answer to this charge is that he repaid the amount in question to his client Pidala, who failed to satisfy the lien in question until after foreclosure proceedings had been commenced against him; that one Moffett, attorney for Firth, had accepted a check for $59 from respondent on October 23, 1924, sent with a letter advising Moffett that Pidala could not pay the mortgage at that time and that by sending that letter and the $59 check, respondent was absolved from any responsibility to satisfy the lien. He claims to have paid Pidala $1,000 in cash on November 7, 1924, which included the $935.55 paid to him on the closing.

In relation to this defense it is to be noted that respondent admittedly had not paid the $935.55 or any part thereof to either Pidala, the Franktone Company or Firth, up to October 23, 1924, which was a month and a half after the receipt of the money which he was to pay over forthwith, in view of all the circumstances. He claims that the letter to Moffett of October twenty-third, inclosing $59 for interest, was written "in order to learn if Mr. Moffett had any objection to waiting for his money." He claims the acceptance of this $59 by Moffett altered the nature of his relationship to Pidala and the Franktone Company, and his responsibility to pay over the $920.55 paid by the Franktone Company. But the Franktone Company which paid the money, was responsible as mortgagor and was vitally interested in having the release obtained, was never consulted about the transaction and never assented thereto.

The transcript of the respondent's bank account in the Pennsylvania Exchange Bank shows that he deposited the check received from Pidala in that bank on September 10, 1924. At the time he made the deposit he had a balance in his account of $209.04. The transcript shows that immediately after depositing the Pidala money he drew out the greater part thereof. On September 11, 1924, the day after he deposited the Pidala money, checks drawn by him on the account aggregating $885 were presented for payment and his balance was thereby reduced to $339.59. On September 12, 1924, the balance dropped to $109.59. On September 16, 1924, the balance amounted to only $31.59 and during the balance of the month of September there were only two days when he had more than $900 to his credit. The transcript proves that the respondent did not hold the money given to him in trust for the purpose of paying the Firth mortgage until October 23, 1924, and his testimony to that effect is palpably false.

When respondent paid Pidala the $1,000 he took from him the following receipt:

" *Nov.* 7, 1924

" Received from Mortimer Elliott the sum of $1,000.00 in cash; this sum includes moneys received by Mr. Elliott in the transaction with the Franktone Building Company.

" I hereby acknowledge the fact that I instructed Mr. Elliott not to pay over the sum of money received by him as the closing of said transaction, for the purpose of releasing a certain lien against the property in question.

" FRANK PIDALA."

Pidala's testimony was that when he signed this receipt, he did not know that respondent had converted the money given to him to discharge the mortgage and thought it had been paid.

The most favorable thing that Pidala could say for respondent, though obviously anxious for some reason to help him in these proceedings, was that the Franktone Company was supposed to do all the repairs for him, and he told respondent to hold it back awhile, and as the company never showed up to do the repairs, presumably some one was entitled to withhold this money for them. But the Franktone Company never assented to this.

The vital point in this charge is that respondent received the sum of nine hundred and thirty-five dollars and fifty-five cents to be applied to a specific purpose, the discharge of the balance due on a mortgage. This money was paid to him on September 8, 1924. Respondent deposited the funds in his personal account and immediately began to withdraw them, his balance dropping as low as thirty-one dollars and fifty-nine cents. When he claims that in some mysterious way he had made a new agreement for all the parties on October 23, 1924, by the payment to Moffett of fifty-nine dollars interest, he had already been guilty of the conversion of practically all the trust fund committed to his care and had proven unfaithful to his trust and to his professional obligation.

(5) *Abraham and Leib Sluchansky.*

In 1922 Abraham and Leib Sluchansky, who are house painters, purchased stock in the North American Mortgage and Building Corporation. Abraham Sluchansky purchased fifty shares of preferred stock and fifty shares of common stock, for which he paid $1,000. Leib Sluchansky purchased thirty shares of preferred stock and thirty shares of common stock, for which he paid $600.

In the fall of 1925 Abraham Sluchansky tried unsuccessfully to induce the corporation to take back his stock and to refund the purchase price. Thereafter, upon the recommendation of a tailor named Danchick, who lived in the same neighborhood as the

Sluchanskys, Abraham Sluchansky went to the office of the respondent, in company with Danchick, and consulted the respondent regarding the collection of the face value of the stock certificates purchased by him as aforesaid. Neither Abraham nor Leib Sluchansky had ever met the respondent before this interview. The respondent, according to the testimony of Abraham Sluchansky, stated to him that he could easily turn the stock into cash and that he would charge a fee of ten per cent for his services in the matter. Abraham Sluchansky thereupon indorsed, assigned and delivered his stock certificates to the respondent. The certificates representing the sixty shares of stock purchased by Leib Sluchansky were also indorsed, assigned and delivered to the respondent. Thereafter the respondent caused new certificates to be issued by the company in his name in place of those previously issued to the Sluchanskys which had been assigned to him as above stated, and subsequently he surrendered these new certificates to the company and received from the company the sum of $1,200 therefor, that amount being seventy-five per cent of the face value of the certificates. He received this money in two payments, to wit, on December 19, 1925, $750, and on February 3, 1926, $450.

The respondent has failed to pay over to either Abraham or Leib Sluchansky any part of the sum of $1,200 received by him upon the surrender of the stock certificates as above stated.

Abraham Sluchansky testified that after he had delivered the stock certificates to the respondent he called at respondent's office on several occasions, continuing to do so through the summer of 1926; that on some occasions the respondent was not in his office and that on other occasions the respondent informed him that he had been too busy to attend to the matter of the stock certificates; that he could not collect the money and that he would have to bring the matter into court but the courts were closed and that the matter would be attended to later. The respondent did not inform Abraham Sluchansky on any of these occasions that the stock had been surrendered and the proceeds, amounting to $1,200, collected by him.

In November, 1926, about eleven months after the stock had been surrendered to the corporation by the respondent and he had received the $1,200 as above stated, the Sluchanskys called upon the respondent and inquired concerning their stock certificates and the collection of the proceeds thereof. The respondent then delivered to them two papers, each of which bore his signature as attorney for the plaintiff. The following is a copy of one of these papers:

" City Court of the City of New York

ABRAHAM M. SLUCHANSKY,
                    Plaintiff,

            *against*

NORTH AMERICAN MORTGAGE AND
    BUILDING CORPORATION,
                    Defendant.

" It is hereby stipulated and agreed that the above entitled action be discontinued upon payment to the plaintiff's attorney herein of the sum of One Thousand ($1,000.00) Dollars on or before December 15th, 1926 and that an order to that effect may be entered by either party hereto without further notice.

" Dated, New York, November 13th, 1926.

                    " MORTIMER ELLIOTT,
                            " *Attorney for Plaintiff.*

    " .........................
                            " *Attorney for Defendant.*"

The other paper is in all respects similar, except that the name of the plaintiff in the action is stated to be Leib Sluchansky and the amount named is $600.

Abraham Sluchansky also testified that in the fall of 1926 his father went to the office of the North American Mortgage and Building Corporation and ascertained that the stock certificates which had been given to the respondent had been surrendered and that respondent had received $1,200 in payment therefor, and he reported these facts to Abraham, who then went to the respondent's office and demanded the stock or the proceeds thereof. It was on this occasion that the respondent delivered the so-called settlement stipulations which provided that the actions therein described were to be discontinued upon the payment of $1,600 (the full face value of the stock certificates) on or before December 15, 1926. Abraham and Leib Sluchansky both testified that they called at the respondent's office in December, 1926, after the time fixed in the stipulation for the payment of the money, and that the respondent then stated to them that he had lost his automobile that day and was unable to take the matter up with them. The Sluchanskys then brought the matter to the attention of the Association of the Bar of the City of New York. Leib Sluchansky also testified that he signed the indorsement on his stock certificates and gave them to Abraham Sluchansky for delivery to the respondent and that he at no time appeared before a notary public and acknowledged his signature to the indorsement on the certificates. He also stated that he did not see the respondent

at any time until about eight months after the delivery of the certificates.

The respondent's version of what took place in the course of his conversation with Abraham Sluchansky appears in the following extracts from his testimony: " Q. What were the circumstances under which you met Abraham Sluchansky or Leib Sluchansky? A. Abraham Sluchansky came to my office for the first time in company with a man named Alexander Danchick, who is my tailor, and with whom I had some conversation as to obtaining moneys. * * * Q. What conversation took place in your office on this occasion when Abraham Sluchansky came to your office in company with Alexander Danchick? A. Mr. Danchick introduced Mr. Abraham Sluchansky to me, and thereupon Mr. Abraham Sluchansky informed me that he had certain stocks in the North American Building Company, and that he was fearful that the stock was unsafe, and that he might not get his money for them. He also stated that he had called at the offices of the company on several occasions, and while receiving promises of payment, that he had seen no possibility of getting any money. By Mr. Chrystie: You said Sluchansky was telling you all this? A. Yes, I asked him what he wanted me to do. He replied that he understood from Alexander Danchick, that I would take up this stock and assume the responsibility for it, and that the proceeds could be used by me, upon certain terms we were to agree upon. * * * Q. What conversation did you have with Abraham Sluchansky on the next occasion that he called to see you? A. He informed me that I could go ahead with this matter, as I saw fit, and that he was satisfied to have me secure not less than 75% of the amount of the certificates, and make use of the money until December, 1926."

He insists that the stock certificates were indorsed by both Abraham and Leib Sluchansky and that the signatures were acknowledged in the presence of Morris Eisenberg, a notary public. " I will produce him " (notary), and repeated the substance of his conversation with Leib and Abraham Sluchansky on that occasion as follows: " Q. What conversation was had by you at the time, with Abraham Sluchansky and Leib Sluchansky? A. I informed Mr. Leib Sluchansky that I had an arrangement with his nephew, Abraham Sluchansky, to dispose of this stock by whatever proceedings I saw fit, and to utilize these moneys until December, 1926, upon condition that I returned 75% of the face amount, and interest at 2% per month. Leib Sluchansky answered that he was willing to do anything that his nephew wanted him to do, that he was perfectly satisfied."

The respondent claims that he informed Abraham Sluchansky by telephone that he had collected the money.

The respondent testified as follows regarding the commencement of actions in behalf of the Sluchanskys against the North American Mortgage and Building Corporation: " Q. Mr. Elliott, was ever an action started in this matter of Sluchanski against the North American Mortgage & Building Corporation? A. Looking through my files, I find that a summons was prepared, but I learned it was never served."

The respondent's version as to what took place at the time he gave the Sluchanskys the so-called stipulations of settlement is as follows: " The witness: At that time, they informed me, or Abraham Sluchansky informed me, that they would like to have something to show his father with reference to the matter, because he was constantly annoyed by his father over his having left the certificates of stock with me, and asked me to give him some paper in connection with the matter. I now recall taking from my file some stipulations that I had at one time prepared, but which were never executed by anybody but myself. I found only — By Mr. Chrystie: Q. Do you mean by that Exhibits 49 and 50 that are in the evidence? A. Let me see them. Q. The stipulations that are in evidence? A. Yes, let me see them. The referee: They are already in evidence. Mr. Chrystie: They are already in evidence as petitioner's Exhibits 49 and 50. The witness: I informed him there was no need of my giving him anything like that, because any papers I had were never carried to the point of suit, because I had received the checks without bringing any suit, and never effected process of any summons, and I did not want to give him any papers. Well, he said: ' Let me have something from the file.' I happened to have two carbon copies I have here, of a stipulation I had prepared. Q. I have those that you gave him? A. I know. That I had prepared on November 13, 1925, and handed them to the girl. Q. What, 1925? A. Yes. Q. The stipulations are dated 1926. A. I am testifying now, Mr. Chrystie. Let me finish my testimony. Q. Aren't you talking about the Exhibits? A. No, not yet. Q. I beg your pardon. I thought you misstated the date, that is all. A. No, if I made a misstatement, it may have been due to myself, in being my attorney right along. And I handed them to the girl to make copies, because I only had a carbon copy of each. ' Dated, New York, November 13th, 1925, (Signed) Mortimer Elliott, Attorney for plaintiff. Attorney for defendant.' * * *

" Q. What did you do with these stipulations that have been marked respondent's Exhibits 31 and 32? A. Handed them to my stenographer, and asked her to make copies of them, which she proceeded to do. I did not examine them. And handed a

copy of each of respondent's Exhibits 49 and 50 to Abraham Sluchansky and Leib Sluchansky. Q. State under what circumstances you handed those respondent's Exhibits 49 and 50. A. They wanted to have some paper in connection with the matter to show to their father, and I got them copies of stipulations that I had prepared in 1925, and had never used them. Q. Mr. Elliott, I call your attention to the fact that the stipulations, which are marked respondent's Exhibits 31 and 32, and those that you handed to Sluchansky, marked petitioner's Exhibits 49 and 50, differ in date, as to year. Will you explain that? A. Yes, I will explain that. The girl having in mind the year 1926 — Mr. Chrystie: I object to what the girl had in mind. The referee: What did she do? The witness: She copied the stipulation, instead of putting the year 1925, she put the year 1926. The referee: That is another proposition."

While claiming that the stipulations were genuine, though only signed by himself, he admitted that he had no information that the summons in the alleged City Court action had ever been served, and though no one had told him so, he believed they were served. He admits that when he handed the stipulations to Sluchansky there were no such actions pending as they purported to relate to, and he had received the money for their stock seven months before. Now, relying on having commenced such an action for his clients in 1925, in his answer to the supplemental charges herein, filed in this court, he said: " The respondent, on the other hand, denies that he ever agreed to bring any action or that such an understanding existed between him and the complainant."

When the respondent appeared before the grievance committee he claimed that the stipulations of settlement had been given to Abraham Sluchansky in order to enable him to satisfy his father that an action was pending. There was no action pending.

When the respondent testified before the official referee he changed his story and said that the copies of the stipulations were given to Abraham Sluchansky to use for the purpose of convincing his father that the stock had been given to respondent to sell and that he was to have the use of the proceeds. This claim is ridiculous on the face of the stipulations. Instead of establishing a transaction of the character now described by the respondent, the contents of the stipulations show that they were unquestionably prepared to prove that an action was still pending. They could not possibly be of any use in an effort to convince the father that a transaction of the character now described by respondent had been entered into.

The stenographer was not produced to explain the alleged error strangely made by which the date 1926 was four times mistakenly

substituted for 1925, claimed to have been made by her while copying the original stipulation drawn up in 1925. It is interesting to note that the alleged summonses in the alleged City Court actions instituted by respondent are dated November 7, 1925, which is three weeks prior to the date of the indorsements on the stock certificates assigning them to respondent.

Morris Eisenberg, the notary who apparently took the acknowledgment of the transfers (which fact was denied by Leib Sluchansky) and whom respondent said he would produce, was never in fact called by him as a witness.

A thorough examination of the testimony and exhibits in this proceeding satisfies us that respondent is guilty on each and all of the five charges made against him as the learned official referee has found; that the charges have been fully and fairly established by satisfactory and unanswerable proof; and that respondent has failed to establish any of his defenses thereto. He has converted the money of his clients to his own use, has made restitution on some of the transactions only after the filing of complaints against him with the Bar Association, has utterly failed to make restitution in the other (Sluchansky) case, has given false explanations to meet the exigencies of the occasion and has demonstrated completely his unfitness to be a member of the bar. His prior suspension should have served as a warning to him, for there too he had converted a client's funds. He escaped more severe punishment because of his youth and inexperience. (*Matter of Eisenberg*, 173 App. Div. 598.) The present record shows an entire absence of any realization of his duty to his clients and the ethical and legal requirements of his profession.

He should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred. Motion to refer back denied.